## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICOLE DING,                          :
      Plaintiff,                   :
                            :   NO. 3:12-cv-1835
      v.                             :
                            :   (JUDGE NEALON)
CAROLYN W. COLVIN,[1]                 :
Acting Commissioner of Social Security, :
      Defendant                    :

**FILED
SCRANTON**

MAR 2 8 2014

PER _____

DEPUTY CLERK

### MEMORANDUM

     The above-captioned action is one seeking review of a decision of the Commissioner of

Social Security ("Commissioner") denying the claim of Plaintiff, Nicole Ding, for social security

disability insurance benefits.  For the reasons set forth below, the decision of the Commissioner

will be vacated and the case will be remanded.

     Disability insurance benefits are paid to a claimant if that individual is disabled and

"insured," that is, the individual has worked long enough and paid social security taxes.  The last

date that a claimant meets the requirements of being insured is commonly referred to as the "date

last insured."

     The administrative law judge ("ALJ") determined that Ding met the insured status

requirements of the Social Security Act through March 31, 2009.  (Tr. 12, 14).[2]  In order to

establish entitlement to disability insurance benefits, Ding was required to show that she suffered

from a disability on or before that date.  42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal
Rule of Civil Procedure 25(d).

2. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of
the Answer on November 15, 2012.  (Doc. 10).

404.131(a); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Ding was born in the United States on October 9, 1983 and was twenty-five years of age on the date last insured; thus, at all times relevant to this matter she was considered a "[y]ounger person"[3] whose age would not seriously affect her ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 17, 29). She has a bachelor's degree in music with elective studies in psychology, a minor in psychology, and a minor in flute. (Tr. 29). Ding has never been employed in this field and last worked as an administrative assistant doing secretarial duties for Campus Door, a business that works with student loans. (Tr. 29-30). She was employed by Campus Door from June 2002 until June 29, 2006. (Tr. 29-31, 164). Ding also had a work study job in the campus mail room at Shenandoah University from September 2002 until May 2006. (Tr. 29, 49, 132, 171). During the weekends and in the summer of 2005 and 2006, Ding was a catering supervisor. (Tr. 29-31, 132, 171).

On June 5, 2009, Ding filed an application[4] for a period of disability and disability insurance benefits alleging disability beginning August 1, 2006, due to chronic pain from, inter alia, endometriosis and migraines.[5] (Tr. 108-109). The claim was denied initially on October 1, 2009. (Tr. 63-67). On November 4, 2009, Ding requested a hearing before an administrative law

3. The Social Security regulations state that a person age fifty (50) or younger is classified as "[y]ounger person." 20 C.F.R. § 404.1563(c).

4. Previously, on July 25, 2007, Ding filed an application for disability insurance benefits alleging disability beginning July 2, 2006. (Tr. 105-107). The claim was denied on March 10, 2008, and no further action was taken. (Tr. 60-62, 44-45).

5. Numerous conditions were alleged and/or considered as limiting Ding's ability to work, including depression, endometriosis, fibromyalgia, chronic pain, chronic fatigue, migraines, headaches, and cellulitis of toes. See (Tr. 31, 63, 68, 70, 159, 182).

judge. (Tr. 68-70). An ALJ hearing was held on August 23, 2010. (Tr. 24-57). On October 20,

2010, the ALJ issued a decision denying Ding's application. (Tr. 12-19). On December 16,

2010, she requested that the Appeals Council review the ALJ's decision. (Tr. 201-202). On July

24, 2012, the Appeals Council concluded that there was no reason to review the ALJ's decision,

which means that it stood as the final decision of the Commissioner. (Tr. 1-3).

Ding filed a complaint in this Court on September 12, 2012. (Doc. 1). Ding argues that

the ALJ erred: (1) "in failing to discuss why the evidence of Stage 3 endometriosis wasn't given

controlling weight"; (2) "in finding the Plaintiff undoubtedly suffered from intense pain at times

without discussing whether her limitations increased at those times and what those limitations

were"; and (3) "in finding that the Plaintiff suffered from intense pain at times but failing to

credit her testimony regarding her limitations when she had intense pain." (Doc. 13, p. 4).

Supporting and opposing briefs were submitted and the appeal is ripe for disposition. (Docs. 13-

14). For the reasons set forth below, Ding's appeal will be granted.

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues

decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91

(3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir.

1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of

the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d

Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are

supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari,

247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to return to his or her

past work, and (5) if not, whether he or she has the residual functional capacity to perform other

work in the national economy. Id. At step four, the Commissioner must determine the

claimant's residual functional capacity. Id. "The claimant bears the ultimate burden of

establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372

F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs existing in

significant numbers in the national economy, considering the claimant's age, education, work

experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis. See

Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis

contemplates full-time employment and is defined as eight hours a day, five days per week or

other similar schedule. The residual functional capacity assessment must include a discussion of

the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an individual is still able to do despite

the limitations caused by his or her impairment(s).").

**Medical Background**

Ding began experiencing pelvic pain sometime between 2001 and 2004. (Tr. 130, 160,

209, 444, 456). The pain was worse during her menstrual periods. (Tr. 253). She was placed on

oral contraceptive pills (OCPs) in her first year of college with improved pain. (Tr. 456). Her

pain increased in severity in 2005 and her OCPs were switched without compete resolution of her

pain. (Tr. 209, 444).  In April 2005, Ding underwent a laparoscopy which revealed

endometriosis. (Tr. 209, 255).  Hormone therapy continued, and a few months later her pain

returned. (Tr. 209, 253, 456).

By February 2006, Ding was taking chronic analgesics with pain minimally to moderately

controlled. (Tr. 599).  A second laparoscopy was performed on February 22, 2006, which was

normal and did not show any evidence of endometriosis. (Tr. 253, 456, 599-600).  Ding started

continuos Yasmin after the surgery, but her pain began to increase in severity again a few months

later. (Tr. 209, 333, 456).

On March 23, 2006, Ding went to the Emergency Department at Penn State Hershey

Medical Center complaining of abdominal pain. (Tr. 597-598).  She described a sharp and

constant pain that had begun the previous evening. (Tr. 597).  Ding had been taking one or two

Percocets a day for her pain. (Id.).  Michael W. Faulk, M.D., and Catherine L. Nelson-Horan,

M.D., diagnosed her abdominal pain as a likely exacerbation of endometriosis at the onset of her

menses. (Tr. 598).  Ding experienced pain relief after being given Morphine and Dilaudid. (Id.).

A laboratory evaluation showed no sign of infection. (Id.).  She was discharged home and

advised to follow-up with her OB/GYN, Rae L. Kennedy, M.D. (Id.).

On June 19, 2006, Ding treated with Dr. Kennedy at the Milton S. Hershey Medical

Center. (Tr. 464-465).  She reported that her pelvic pain had greatly improved since using

Yasmin, but she had increased incisional pain over the prior few days, for which she was taking

Vicodin. (Tr. 464).  Dr. Kennedy found no drainage from the site and much improved symptoms

of endometriosis. (Id.).  Ding was issued refill prescriptions for Celebrex and Vicodin, in greater

quantity because she was moving out of the area. (Id.).

7

Richard Thomas Griffey, M.D., at Brigham & Women's Hospital ("BWH") in Boston, Massachusetts, saw Ding on August 23, 2006 for bilateral lower quadrant abdominal pain. (Tr. 223-224, 257-259). A pelvic ultrasound showed no evidence of endometrioma or free fluid. (Id.). She was treated in the Emergency Department with Dilaudid and discharged in satisfactory condition. (Id.).

Elena Yanushpolsky, M.D., OB/GYN, examined Ding on September 7, 2006, regarding long-standing pelvic pain and endometriosis. (Tr. 255-256). Ding reported that her pain was so debilitating that she was unable to work. (Id.). Dr. Yanushpolsky recommended she consider alternative approaches to her pain, such as possible gastrointestinal causes, acupuncture, and treatment by a pain clinic. (Id.). Ding was frustrated that her pain had not been adequately addressed and left in the middle of the appointment. (Id.). Her husband stayed, and Dr. Yanushpolsky advised that Ding may need psychological support in addition to the non-conventional approaches to her pain. (Id.).

On September 11, 2006, Ding was treated by Srdjan Nedeljkovic, M.D., at the Pain Management Center for complaints of chronic pelvic and abdominal pain. (Tr. 221, 253-254). She complained that the pain was constant, no longer changing in intensity during her periods, but was worse when walking and standing and with bowel movements and sexual activity. (Tr. 253). Examination revealed some tenderness in the lower lumbar spine region and in the paraspinous region, and significant tenderness in the abdominal area. (Tr. 222, 254). Ding's gait was normal and she could "stand and walk on heels and toes normally." (Id.). Dr. Nedeljkovic outlined a pain management plan that included physical therapy, cognitive behavioral techniques, and pharmacotherapy of Neurontin, Relafen, and Ultram as needed. (Id.).

At Ding's follow-up appointment with Dr. Nedeljkovic on October 11, 2006, he noted that she had begun a program of physical therapy, but attended only one session because she felt that it aggravated her back pain. (Tr. 203, 219, 251). Dr. Nedeljkovic recommended that Ding continue the multidisciplinary program and increased her medication dose. (Id.).

Dr. Nedeljkovic referred Ding to Anne T. Wolf, M.D., M.Sc., a gastroenterologist, who performed an examination on October 26, 2006. (Tr. 248-249). Dr. Wolf noted that Ding complained that she had left lower quadrant abdominal pain with every bowel movement that would last for up to a day and was worse during her menses. (Id.). Ding described her pain as stabbing and constant. (Id.). Dr. Wolf listed a differential diagnosis that included endometriosis, irritable bowel syndrome, and inflammatory bowel disease. (Id.). She scheduled a CT scan and a colonoscopy. (Id.). A CT scan on October 26, 2006, offered no explanation for Ding's right lower quadrant abdominal pain. (Tr. 210, 230, 232, 238).

Ding saw Elizabeth Sarah Ginsburg, M.D., for a second opinion regarding her endometriosis and chronic pelvic pain on November 7, 2006. (Tr. 216, 245). Ding reported being in a fetal position during periods and getting bad stabbing pain during bowel movements. (Id.). Dr. Ginsburg opined that uterosacral ligament ablation is not likely to help because Ding's stabbing lateral pain is much worse than her dysmenorrhea. (Id.). The proposed plan was for a laparoscopy and tubal lavage, and for Ding to discuss uterine suspension. (Id.). Ding requested surgery as soon as possible because she was unable to work due to the pain. (Id.).

Before seeing Dr. Nedeljkovic again, Ding had a colonoscopy and CT scan, both of which were normal. (Tr. 206, 214, 242). An endoscopy report dated November 13, 2006, revealed mild erythema of the splenic flexure and no masses or polyps. (Tr. 228). On November 22,

9

2006, Dr. Nedeljkovic noted that Ding's pain was greatly exacerbated during her menstrual cycle and adjusted her medication by discontinuing Ultram, adding Effexor, and giving a one-time prescription for Vicodin. (Tr. 206, 214, 242).

On November 27, 2006, Ding went to the Emergency Department at BWH complaining of lower abdominal pain. (Tr. 213, 241). An abdominal examination revealed mild tenderness in the lower quadrants. (Tr. 241). Heikki Nikkanen, M.D., noted that Ding's chronic endometriosis or chronic abdominal pain appeared to be "slightly worse than before." (Tr. 241). Ding's pain subsided after being given Morphine, Toradol, and Dilaudid. (Tr. 213, 241). She was discharged and advised to follow-up with OB/GYN and Pain Service. (Id.).

On December 11, 2006, Ding went to the Emergency Department at BWH for chronic pelvic pain. (Tr. 212). She had some left lower quadrant tenderness without rebound and a pelvic exam revealed some left greater than right adnexal tenderness, but was otherwise normal. (Id.). Her pain was improved with IV fluids, Reglan, and Dilaudid, and she was released with oral Dilaudid. (Tr. 212, 240).

On December 14, 2006, Ding returned to the Emergency Department at BWH for the third time in two weeks for severe pelvic pain. (Tr. 208). Upon arrival, she was "crying in pain." (Id.). The medical note indicates that Ding was "unable to work/walk well." (Tr. 226). There were no signs of infection or need for surgical intervention, and her radiology report was normal, but she was admitted to GYN for a pain control plan. (Tr. 210, 235). Her discharge summary from December 15, 2006, noted that Ding could resume regular exercise. (Tr. 226).

Ding was referred to John C. Petrozza, M.D., for a consultation regarding her chronic pelvic pain. (Tr. 316). On January 17, 2007, she met with Dr. Petrozza and Aaron K. Styer,

M.D. (Tr. 316-331, 519-526). Ding stated that her pain had progressively worsened over the previous six months to the degree she had been unable to work since June 2006, and intercourse was too painful. (Tr. 317, 321, 520). She complained of baseline 7/10 dull pelvic pain with intermittent sharp pains and significant exacerbation during bowel movements and menses. (Tr. 317, 520). The report states that Ding's "symptoms have progressively worsened over the past 6 months to the degree she is unable to work and intercourse is too painful. ... The only consistent alleviating maneuvers are the fetal position and/or lower back massage." (Tr. 317). An abdomen exam revealed moderate tenderness with deep palpation in the right lower quadrant and mild tenderness in the left lower quadrant. (Tr. 322). Considering that Ding had a repeat laparoscopy less than a year earlier, Dr. Petrozza and Dr. Styer recommended a course of medical therapy before proceeding with another surgery. (Tr. 323, 525). Several options were discussed and she was issued a script for Ultram and Vicodin. (Tr. 324, 526).

On February 2, 2007, Ding met with Kim D. Ariyabuddiphongs, M.D., for establishment of a primary care physician. (Tr. 365-367, 414-416). She complained of constant pelvic pain. (Tr. 365). Dr. Ariyabuddiphongs noted that Ding's "pelvic pain is worse with sex and bowel movements and she is unable to work." (Id.).

She had a follow-up appointment with Dr. Ariyabuddiphongs on February 16, 2007, and requested a narcotics prescription for her abdominal pain, stating that she was responsive to narcotics. (Tr. 363). The report indicates that Ding complained of a persistent debilitating abdominal pain that made her unable to work or engage in usual activities. (Id.). Ding was treating with Dr. Styer for endometriosis, but he had a policy of not giving out narcotics for abdominal pain. (Id.). Dr. Ariyabuddiphongs prescribed a limited quantity of oxycodone and an

anti-inflammatory. (Tr. 364).

On March 1, 2007, Dr. Ariyabuddiphongs treated Ding and noted that she was doing well on Oxycodone but complained of a two-week history of bilateral lower abdominal pain. (Tr. 359). Ibuprofen, an anti-inflammatory, and Naproxen were added to her medications. (Tr. 360). On March 29, 2007, Ding was given a four-week prescription of Oxycodone, which would be rewritten upon request. (Tr. 358, 413).

On April 11, 2007, Ding met with Dr. Petrozza and Dr. Styer to discuss the progress of her chronic pelvic pain. (Tr. 296, 513-515). Ding was advised that an MRI on April 6, 2007, revealed T1 bright focus in the left adnexa and left ovary which could represent endometrial implants. (Tr. 284-292, 489, 504, 514, 545). Ding stated that she had decided to proceed with surgery. (Tr. 298, 515).

During a preoperative visit on May 9, 2007, Dr. Petrozza and Dr. Styer discussed surgery options with Ding because a recent three-month course of aromatase inhibitor was unsuccessful. (Tr. 284-292, 503-510). The report indicates that her symptoms "have progressively worsened over the past 6 months to the degree where she is unable to work and intercourse is too painful." (Tr. 286). She decided to proceed with both diagnostic laparoscopy and uterine suspension. (Tr. 284-292, 503-510).

At a follow-up appointment with Dr. Ariyabuddiphongs on May 10, 2007, Ding complained of bilateral pelvic bone pain and headaches. (Tr. 356-357, 411-412). She also reported feeling depressed because she could not enjoy usual activities. (Tr. 356, 411). Dr. Ariyabuddiphongs prescribed an antidepressant and added OxyContin to her narcotic prescription. (Tr. 354-355). See also (Tr. 411-412) (follow-up appointment on June 8, 2007).

On May 24, 2007, Dr. Petrozza, assisted by Dr. Styer and Dr. Janelle Luk, performed

three surgical procedures on Ding, a laparoscopic laser excision of endometriosis, lysis of

adhesions, and uterine suspension. (Tr. 332, 533-542, 607-609). Her postoperative diagnosis

was pelvic pain, stage III endometriosis, collisional dyspareunia, and left ovarian adhesions. (Tr.

332, 533, 607). The following day, she was experiencing some pain and was advised to rest.

(Tr. 281). On May 27, 2007, she complained of swelling in her ankles and stiffness in her joints,

but denied any leg pain. (Tr. 279-280).

On June 6, 2007, Ding had a postoperative visit with Dr. Styer and Dr. Petrozza. (Tr.

268-277, 491-499). Dr. Styer noted improvement following the procedure. (Tr. 276, 497). They

discussed postoperative suppressive therapy and decided on a course of treatment of OCPs with

narcotic management by Ding's primary care physician. (Tr. 276-277, 497-498).

Ding had a follow-up appointment with Dr. Ariyabuddiphongs on June 8, 2007. (Tr. 354-

355). She complained of right hip pain, occasional numbness, and tingling in her leg. (Tr. 354).

Dr. Ariyabuddiphongs concluded that because of her chronic abdominal pain, Ding was suffering

from a degree of depression. (Tr. 355). Additionally, he ordered an MRI of the lumbar spine and

an x-ray of the right hip. (Id.). A radiology report dated June 8, 2007, revealed no evidence of

degenerative change of the right hip. (Tr. 377). On June 13, 2007, she was evaluated for an

acute fracture, but the results showed a normal MRI of the lumbar spine. (Tr. 376).

On June 12, 2007, Ding went to the Beth Israel Deaconess Medical Center for right leg

weakness and pain, and was admitted to rule out a central lesion. (Tr. 351-353, 368-373, 395-

400). An MRI of the brain, an MRI of the lumbar spine, and a pelvic x-ray were normal. (Tr.

349, 371, 402-403). On June 13, 2007, Ding was examined by Dr. Narayanaswami, who found

13

that some features were difficult to explain from a neurologic standpoint and recommended social services involvement to assess whether stressors were playing a role. (Tr. 349-350). Dr. Narayanaswami noted that Ding denied any depression. (Tr. 349). By June 14, 2007, her leg weakness and hip pain, although still present, had improved and she was discharged with outpatient physical therapy. (Tr. 348, 371, 410).

Ding had a follow-up appointment with Dr. Ariyabuddiphongs on July 3, 2007, at which time a muscle relaxer was added and her medication was scheduled to change from OxyContin to MS Contin with breakthrough oxycodone as needed as of August 1, 2007. (Tr. 346-347).

On July 26, 2007, Ding complained to Dr. Ariyabuddiphongs of blurry vision, weakness, trouble sleeping, intermittent numbness, and increased pain. (Tr. 344-345, 407). She was concerned that she had the same symptoms as her father, who had been diagnosed with fibromyalgia. (Tr. 344, 408). Ding's medications were again adjusted, a fentanyl patch was added, and she was referred to a pain clinic. (Tr. 345, 408).

On September 23, 2007, Ding went to the Emergency Department at the Beth Israel Deaconess Medical Center complaining of right lower quadrant abdominal pain, worsening over four days. (Tr. 343). A CT scan and labs were normal, with "[n]o findings to explain the right lower quadrant pain", and she was discharged with a prescription of Dilaudid. (Tr. 343, 374-375, 401-402, 406).

On October 11, 2007, Allison Bailey, M.D., evaluated Ding on referral from Dr. Petrozza. (Tr. 489-490). Ding complained of back and pelvic pain, aggravated by bowel movements and intercourse, as well as headaches and poor sleep. (Tr. 489). She rated her pain as a 10 out of 10 in severity over the last month and described it as a dull pain with intermittent sharp episodes.

(Id.).  She reported being out of work since June and "decreased pain even household activities due to this problem."  (Id.).  Dr. Bailey found that Ding had chronic pelvic pain with a history of endometriosis and superimposed myofascial pain.  (Tr. 490).  They discussed the risk factors for ongoing pelvic pain, including musculoskeletal issues, likely sensitization, and hormonal issues. (Id.).  Dr. Bailey recommended multidisciplinary treatment, a possible change in medications, and referred Ding to the pain center.  (Id.).

M. A. Gopal, M.D., performed a Physical Residual Functional Capacity Assessment on October 23, 2007.  (Tr. 386-393).  He reviewed Ding's function report[6] and found her allegations to be credible.  (Tr. 387).  In evaluating exertional limitations, Dr. Gopal opined that she could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk for about six hours in an eight-hour work day, sit for about six hours in an eight-hour workday, and push and/or pull without limitation.  (Tr. 387).  In the six areas of postural limitations, he concluded that she could stoop, kneel, and crouch occasionally; and could frequently climb ramps/ladders, balance, and crawl.  (Tr. 388).  No manipulative, visual, communicative, or environmental limitations were identified.  (Tr. 389-390).

On October 26, 2007, Ding treated with Dr. Ariyabuddiphongs.  (Tr. 404-405).  Ding reported a left vaginal wall mass, but it was not detected on exam; therefore, Dr. Ariyabuddiphongs advised her to follow-up with her OB/GYN.  (Tr. 405).  Her fentanyl dosage, taken in addition to MS Contin and as need Oxycodone, was increased, as was Ding's dose of

---

6.  On September 24, 2007, Ding, who was living with her husband at the time, completed a Function Report describing her limited abilities and daily activities.  See (Tr. 120-129).  She stated, inter alia, that "I can't lift more than 5-10 pounds"; "I can only walk a block or two before hurting or having to stop"; "It hurts to bend over"; "The pain is sometimes so severe that I am unable to get out of bed"; and "I am unable to sit or stand for long periods."  (Tr. 127-129).

Citalopram, which she took for depression. (Tr. 404-405).

Sometime around January 2008, Ding was treated at the Baxter Drew Wellmon Family

Practice. See (Tr. 477-478) (The initial assessment is undated, but a follow-up appointment is

dated February 28, 2008.). She reported for a physical, requested to have her big toes checked

for infections, and complained of pain from endometriosis. (Tr. 478). A radiology report dated

January 30, 2008, showed no abnormality or evidence of osteomyelitis in Ding's great toes. (Tr.

481). On February 28, 2008, Ding returned because her toes were not better and she was in pain.

(Tr. 477). She was treated for bilateral great toe cellulitis and given prescriptions for MS Contin,

Oxycodone, Flector patch, and Bentyl. (Id.).

Jonathan Gransee, Psy.D., performed a clinical psychological disability evaluation of

Ding on February 28, 2008. (Tr. 417-426). Dr. Gransee found it surprising that Ding did not

have any significant psychological issues considering that her husband had recently stated that he

wanted a divorce, and given that her endometriosis caused her to, at least temporarily,

discontinue her career plans and move back in with her parents. (Tr. 418). Rather, she reported

being relieved that her marriage was ending and happy to be living with her parents again. (Id.).

Ding explained that although she is often in pain and that the pain is debilitating at times, she still

finds some type of enjoyment. (Id.). She denied being severely depressed and explained that she

was on an antidepressant for premenstrual issues. (Id.). Dr. Gransee opined that Ding had no

perceptual disturbances; she had good thought processes, content of thought, abstract thinking,

concentration, orientation, memory, impulse control, judgment, and insight; and she had above

average intelligence. (Tr. 419-421). He found that the reliability of the information appeared to

be good. (Tr. 421). Dr. Gransee diagnosed Ding with endometriosis, hip and leg pain, and

16

psychological stressors related to unemployment and separation. (Id.). He assessed Ding's global assessment of functioning (GAF) at 80.[7] (Id.). Dr. Gransee determined her prognosis, "mentally speaking" to be good. (Tr. 422). He concluded that Ding was capable of competently managing personal finances, had excellent social functioning, and had no impairment on daily living activities as a result of any mental health issues. (Id.). He determined Ding's ability to sustain concentration, persistence, and pace in an eight hour day/forty hour work week "to be excellent with regard to her mental status," but noted there may be physical issues that may affect her ability to work. (Id.).

On March 10, 2008, Judith Kellmer, Ph.D., a state agency psychologist, submitted a Psychiatric Review Technique assessment on Ding, finding no medically determinable mental impairment. (Tr. 427-440). Dr. Kellmer purportedly considered Ding's Function Report and Dr. Gransee's evaluation, highlighting portions of each. (Tr. 439). However, other than repeating statements from these reports, listing her name and the date, and checking the boxes marked "No Medically Determinable Impairment" and "These findings complete the medical portion of the disability determination", Dr. Kellmer failed to complete the form. See (Tr. 427-440).

On March 20, 2008, at the Baxter Drew Wellmon Family Practice, Ding stated that her medication was not helping her chronic pelvic pain and she was again given a prescription for an increased dose of MS Contin. (Tr. 476). At a follow-up on April 17, 2008, it was determined

---

7. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. Diagnostic and Statistical Manual of Mental Disorders 3-32 (4th ed. 1994). The GAF score does not reflect physical illnesses. See McLaughlin v. Astrue, 2013 U.S. Dist. LEXIS 10584, *43 n.14 (W.D. Pa. 2013).

that the increase in MS Contin had "made some improvements with pain management." (Tr. 475). Her prescriptions were renewed, along with a trial of Rozerem to assist with difficulty sleeping. (Id.). By May 6, 2008, it was determined that the Rozerem did not help with Ding's sleep problems so she was switched to Lunesta. (Tr. 474).

Ding was seen again at the Baxter Drew Wellmon Family Practice on June 3, 2008. (Tr. 473). She complained of having had a migraine headache the day before, which had since departed, but claimed that they were occurring more often. (Id.). It was determined that her headache symptoms were likely due to a mixed headache syndrome. (Id.). Ding was advised that her chronic pain medications were potential triggers for headaches, and agreed to try magnesium and vitamins as preventative measures. (Id.).

On June 10, 2008, Ding treated with Dr. Kennedy, whom she had last seen two years prior. (Tr. 462-463, 577, 592-593). On exam, she was found to be in no apparent distress, but "just very anxious and concerned about her diagnosis and managing her pain since several doctors have been very leery to give her pain medications." (Tr. 593). At that time, she was taking Yazmin, Celexa, and Dycyclomine daily and had prescriptions for a dozen other medications to be taken as needed. (Tr. 579). Dr. Kennedy issued a prescription for Dilaudid and a refill for MS Contin and Oxycodone. (Tr. 463, 593).

At a follow-up visit on July 9, 2008, Dr. Kennedy noted that Ding's stage IV endometriosis was slowly improving on her current regimen of Dilaudid, Yaz, and MS Contin, and that Ding reported she was doing well. (Tr. 460). Dr. Kennedy issued refill prescription for Dilaudid and MS Contin. (Id.).

On July 25, 2008, Stephanie J. Estes, M.D., saw Ding on referral from Dr. Kennedy. (Tr.

18

456-459). Ding complained of having leg and back pain, headaches, and stabbing pain almost every day, as well as significant pain with bowel movements. (Tr. 457). She also reported that she was tolerating her pain well, but was on large doses of narcotic medication. (Id.). Dr. Estes discussed numerous therapy options and testing procedures with Ding. (Tr. 458).

Ding had a follow-up appointment with Dr. Kennedy on August 20, 2008. (Tr. 454-455, 590-591). Dr. Kennedy found her endometriosis to better managed on pain analgesics and refilled her prescriptions for MS Contin, Dilaudid, Oxycodone, Fioricet, and Yaz. (Tr. 454, 590). They discussed the possible existence of fibromyalgia. (Id.). Ding reported that "this is the best she has felt in a month" and was able to get out of the house at least two to three times a week as opposed to only two to three times per month previously. (Tr. 590).

Dr. Kennedy issued refill prescriptions again on October 17, 2008. (Tr. 452-453). On December 10, 2008, Ding saw Dr. Kennedy for a follow-up and medication refill. (Tr. 450-451, 583). She reported doing well until the prior month when her pain led to sleep problems. (Tr. 450). Dr. Kennedy gave Ding a consult form for Physical Therapy and for Rheumatology to evaluate for possible concurrent fibromyalgia. (Id.). Dr. Kennedy "urged her to reapply for disability." (Id.). Dr. Kennedy stated that she "would write a letter for her in support of either disability or medical assistance." (Id.).

The next medical record in the transcript is dated April 30, 2009, after Ding's date last insured. On that date, Ding visited the Baxter Drew Wellmon Family Practice to have her pain medications refilled. (Tr. 471). The record notes Ding's return "after prolonged absence" as she had been treating with Dr. Kennedy, but a lapse in insurance ended that care. (Id.). Dr. Drew Wellmon and Dr. Nathan Petula ordered an ultrasound. (Tr. 480). Ding underwent a pelvic

19

ultrasound on May 5, 2009, which was negative. (Id.).

On June 4, 2009, Ding had a consult with the Pain Clinic who recommended weaning her MS Contin, discontinuing Oxycodone, and switching her to OxyContin. (Tr. 589). They also suggested adding a tricyclic antidepressant and Effexor, and discontinuing Celexa. (Id.).

Ding reported sleep problems to Dr. Kennedy on June 8, 2009. (Tr. 582, 589). Prescriptions for Bentyl, OxyContin, MS Contin, Fioricet, Nortiptyline, Effexor, Yasmin, and Dilaudid were issued, but Dr. Kennedy noted that she would review the medications and consider changes. (Tr. 589). Ding had recently established care with an outpatient social worker, was still having headaches, but otherwise reported that she was doing okay. (Id.).

Ding was seen at the Baxter Drew Wellmon Family Practice on June 18, 2009, complaining of headaches, nausea, and pain. (Tr. 472). Ding's headache medication was switched from Fiorcet to Toradol and Phenergan. (Id.). On June 29, 2009, Ding reported another migraine and was prescribed Topomax. (Tr. 468). On July 1, 2009, Ding had an MRI of the brain due to increasing migraine headaches, which was found to be a normal. (Tr. 479).

On July 14, 2009, Dr. Kennedy saw Ding and discontinued Celexa, Flonase, Oxycodine, Dycyclomine, and Fiorcet. (Tr. 579, 581, 625-626). Her prescriptions for Bentyl, Zyrtex, MS Contin, Nortiptyline, Yasmin, Dilaudid, Caclofen, Topomax, Esgic, and Imitrex were continued, some at different doses. (Tr. 579). They discussed a possible repeat laparoscopy with possible laser ablation and lysis of adhesions; and consults with the pain clinic, physical therapy, and neurosurgery uses for possible spinal cord stimulator. (Tr. 588, 625).

On July 23, 2009, Dr. Wellmon stated that Ding had slight improvement with the frequency and severity of her migraines; thus, her Topomax prescription was refilled with

20

instructions to increase dose based on response. (Tr. 617, 467).

Ding treated with Dr. Kennedy on August 19, 2009, at which time her prescriptions were renewed and she was given referrals for a bone density and physical therapy. (Tr. 483-484, 580, 586-587, 621-622, 624).

On August 31, 2009, Ding's mother, Barbara Burkholder, with whom Ding was residing, completed a Third Party Function Report.[8] (Tr. 143-150). Ms. Burkholder stated that most days, Ding's "pain doesn't allow her to get out of bed" and that she rarely goes outside. (Tr. 144, 146). She reported that Ding needs help bathing and washing her hair, and occasionally needs assistance putting on her shoes and socks. (Tr. 144). The report notes that although Ding can make sandwiches and microwave meals, she is no longer able to cook complete meals. (Tr. 145). Ms. Burkholder indicated that Ding has trouble walking, standing, and bending, which prevents her from doing household chores and yard work. (Tr. 145, 150).

On September 18, 2009, Ding underwent a central bone density study, which was normal. (Tr. 567-568, 584-585, 650-651).

On September 21, 2009, Dr. Wellmon noted that Ding had seen improvement with regard to her migraines, but continued to have more than two a month. (Tr. 616). Her Topomax dosage was increased. (Id.).

On September 28, 2009, Ding had an initial physical therapy evaluation at the Penn State Hershey Medical Center upon referral from Dr. Kennedy. (Tr. 594-596, 647-649). She complained of being in more pain than experienced previously and having difficulty with simple

--------

8. Ms. Burkholder's report is consistent with Ding's report of the same date. See (Tr. 151-158). The 2009 reports indicate that Ding had some additional limitations since her 2007 Function Report. See (Tr. 120-129).

tasks, such as getting out of bed, standing, and doing things around the home. (Tr. 595, 648). The report notes that Ding "is unable to work" and "is limited with everything throughout the day." (Tr. 594-595). Her posture was assessed to be within functional limits, as was her neurological and range of motion, except for trunk range of motion which was limited about 25%. (Tr. 595). Ding had 3/5 abdominal and lumbar strength, 5/5 lower extremity strength, and increased firmness to palpation throughout the bilateral abdominal region. (Id.). It was determined that Ding's rehab potential was "good." (Tr. 595, 648).

A Psychiatric Review Technique form was completed by Henry Weeks, Ph.D., on October 1, 2009. (Tr. 546-558). Dr. Weeks found non-severe impairments and coexisting nonmental impairments that required referral to another agency. (Tr. 546). He evaluated Ding pursuant to Listing 12.04 and determined that she suffers from Depressive Disorder, NOS. (Tr. 546, 549). Pursuant to the B criteria, Dr. Weeks determined that Ding has mild restrictions in activities of daily living, mild difficulties in social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 556). He then determined that Ding does not meet the C criteria of Listing 12.04. (Tr. 557). Dr. Weeks noted that her depression, diagnosed on June 4, 2009, was primarily the result of her pain. (Tr. 558). He commented that Ding's "statements are found to be partially credible." (Id.).

On December 21, 2009, Dr. Wellmon increased Ding's medication for persistent headaches. (Tr. 615).

On January 29, 2010, David M. Giampetro, M.D., treated Ding due to the loss of her prescribing physician, Dr. Kennedy. (Tr. 642, 644-646). He noted that at a prior consultation in June, he explained that it would be best to wean Ding to lesser doses of opioids; but, since that

time, there had been little change in her opioid therapy and her doctors were uncomfortable managing her opioids. (Tr. 644). Dr. Giampetro commented that Topomax was helping with the migraines, although Ding reported a three-week long migraine that necessitated a trip to the hospital. (Id.). Ding described her chronic abdominal and pelvic pain as 6/10 with no significant changes since her last visit. (Id.). Dr. Giampetro agreed to assume prescribing Ding opioids in the short-term and advised her to find a family doctor willing to manage this. (Tr. 645). He changed her medications, converting her use of MS Contin and hyromorphone to a fentanyl patch. (Id.).

On February 3, 2010, Ding saw Dr. Giampetro, again complaining that her sleep had decreased due to a significant increase in pain. (Tr. 642-643). Dr. Giampetro indicated that she was visibly distressed, but had presented differently to the medical student upon initial interview. (Tr. 642). He noted that the exacerbation in pain was because either the fentanyl was not effective or she was under dosed. (Tr. 643). He switched Ding back to MS Contin. (Id.).

Ding had a follow-up appointment with Dr. Giampetro on February 24, 2010. (Tr. 640-641). Ding stated that she was doing better on MS Contin therapy than the fentanyl, but continued to have constant 8-9/10 pelvic pain with no changes in the description, distribution, or associated symptoms. (Tr. 640). She continued to report that her pain was worse during menses and bowel movements. (Id.). Dr. Giampetro again advised Ding to get a consult regarding opioid therapy, and also suggested that she pursue a psychologist for cognitive behavioral therapies. (Tr. 640-641).

On March 24, 2010, Faith D. Daggs, M.D., referred Ding for trigger point injections and for physical therapy. (Tr. 601-602). She had a physical therapy evaluation at the Milton S.

Hershey Medical Center on May 27, 2010, with the goal of eliminating her low abdominal pelvic pain. (Tr. 571-573, 575, 634-636). The physical therapy report indicates that Ding was seeing a massage therapist every two weeks, which helped with some of the pelvic pain. (Tr. 571). The evaluation notes that she has been unable to work since 2006 and has begun a mild walking program for exercise. (Tr. 572, 634). On exam, her strength was assessed at generally 5/5, she had no gait dysfunction and was independently ambulatory, and tender points were located in the low abdominal area as well as interior hips, but not in the posterior pelvis or back. (Tr. 572). Ding's rehab potential was described as good. (Id.).

On May 6, 2010, Dr. Giampetro and Thomas M. Dunn, M.D., treated Ding at the Chronic Pain Clinic. (Tr. 637-639). She reported that she was tolerating her opioid therapy well and felt ready to decrease her dose. (Tr. 637). Ding stated that she had been using herbal supplements for the past two months, which decreased her pain to 7/10. (Id.). She had no changes in the character or nature of distribution of pain, and was looking into other therapies. (Id.). Dr. Giampetro agreed to gradually decrease the MS Contin. (Tr. 638).

On June 9, 2010, Ding went to the Center for Women's Health because she needed a GYN and was not happy with Hershey. (Tr. 564-566). The records note that she has a history of endometriosis and migraines and had recently begun physical therapy because she could not find a pain specialist to do trigger point injections. (Tr. 566).

On July 7, 2010, Ding had a follow-up appointment with Dr. Giampetro and Filip B. Trojanowski, M.D. (Tr. 631-632). She reported that her pain was slightly better controlled and she had started physical therapy, yoga, and massage therapy. (tr. 631). Ding stated that she still has overwhelming pain about two times a week, but it has improved from when she previously

24

felt this way four or five times a week. (Id.). Dr. Giampetro decided to continue to decrease the MS Contin dose per day and recommended that she continue adjuvant therapies. (Tr. 632).

On July 15, 2010, Laura S. Hamann reported that Ding had been seen for five physical therapy sessions, but had only minimal changes in pain levels and was therefore discontinued from therapy. (Tr. 569, 633).

On July 27, 2010, Shirley A. Albano-Aluquin, M.D., evaluated Ding for fibromyalgia upon referral from Dr. Giampetro. (Tr. 653-657). The report notes that physical therapy the previous year had provided "good relief" for her neck or shoulder pain. (Tr. 653). Dr. Albano-Aluquin stated that Ding had chronic migraines, which come and go and interfere with her activities of daily living. (Id.). Additionally, she had intermittent left wrist pain aggravated by lifting or repetitive movement. (Id.). Ding had fractured this wrist in 2000. (Id.). After examination, Dr. Albano-Aluquin found no evidence of overt fibromyalgia, nor autoimmune disease. (Tr. 654). Dr. Albano-Aluquin opined that Ding mostly likely had osteoarthritis of the left wrist given the previous fracture, and referred her back to Dr. Giampetro. (Id.).

On August 9, 2010, Dr. Wellmon noted that Ding had "seen improvement with frequency and severity of headaches" while on Topomax. (Tr. 614).

On August 11, 2010, Dr. Daggs completed a medical source statement. (Tr. 610-613). Dr. Daggs stated that a functional assessment by physical therapy would be more accurate, but opined that Ding's medical history "could potentially affect duration of standing/sitting as well as ability to lift items." (Tr. 611). Dr. Daggs gave a "guesstimate" that Ding could lift twenty pounds occasionally and ten or less pounds frequently, and could stand and/or walk for at least two hours in an eight-hour workday. (Tr. 610-11). The form notes that Ding conveyed no